THE POSTAL TELEGRAPH-CABLE COMPANY

v.

THE WESTERN UNION TELEGRAPH COMPANY.

*Filed at Ottawa April 1, 1895.*

1. COVENANTS—*in restraint of alienation construed strictly.* Covenants restraining the power of alienation will be construed with the utmost strictness, to the end that the restraint shall not be extended beyond the express stipulation; and all doubts must, as a general rule, be resolved against the restriction.

2. INJUNCTIONS—*when equity will not enjoin breach of negative covenant.* A court of equity will not exercise its jurisdiction to enjoin a breach of a negative covenant, unless it is express or can be fairly implied from the stipulation of the parties, and injury will result to complainant from its breach.

3. LANDLORD AND TENANT—*covenant not to lease for particular purpose, construed.* A restrictive covenant in a lease of offices to a telegraph company, that during the term the lessor will not *lease* offices in the building to any other telegraph company for use as a telegraph office without consent of the lessee, will not prevent another telegraph company, subsequently purchasing the fee subject to existing leases, from *using* the building for its own offices.

*Postal Telegraph-Cable Co.* v. *Western Union Tel. Co.* 51 Ill. App. 62, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. LORIN C. COLLINS, Judge, presiding.

The bill in this case seeks to enjoin the Western Union Telegraph Company from using the premises known as the "Phenix Building," in the city of Chicago, as a telegraph office until the termination of complainant's lease of a portion of the building, April 30, 1898. The material facts are undisputed. The Phenix building is located at the south-west corner of Clark and Jackson streets, fronting east on Clark street, north on Jackson street, and west on Pacific avenue. Its location is especially desirable for telegraph business, being in the business center of the city, and in close proximity to the board of trade,

the custom house and post-office, many of the principal hotels, railway offices, banks, and other lines of business which are largely dependent upon the use of the telegraph. The building was, for many years, owned by the Phenix Insurance Company, a corporation organized under the laws of New York for the transaction of insurance business.

May 1, 1888, the Phenix company leased to complainant, for a term of five years, the east basement room of the Phenix building, including the north-east corner of the building, fronting upon Clark and Jackson streets, to be used as a general telegraph office, at an annual rental of $12,500, payable in monthly installments, in advance. The lease contained the following covenant: "During said term the lessor will not lease offices in said building to any other telegraph company for use as a general telegraph office." Complainant took possession under this lease May 1, 1888, and has ever since been in open and continuous possession of the north-east corner of the basement, using it as its general receiving and delivery office.

April 30, 1892, complainant, desiring to remove its operating room to other premises in the vicinity, took a new lease from the Phenix company of a smaller portion of the basement, but still including the north-east corner, fronting upon Clark and Jackson streets, for a term of six years, to be used as "a general receiving and delivery office, but not as its operating room," at a yearly rental of $9000, payable in equal installments, monthly, in advance. This lease contained the following covenant: "During said term the lessor will not lease offices in said building to any other telegraph company for use as a telegraph office, without consent of the lessee." The former lease was then surrendered and canceled, and complainant has ever since been in open, notorious and exclusive possession of the corner basement, using it as its general receiving and delivery office. All payments of

rental due under both leases have been promptly made by complainant, from time to time, as they accrued, and complainant desires to continue in the use and enjoyment of the premises until the expiration of its term, and has never consented to the use of any portion of the building by the Western Union Telegraph Company. The lease of April 30, 1892, was recorded in the recorder's office of Cook county August 4, 1892.

The principal inducement leading complainant to the execution of each of the leases, as stated in the bill, was to obtain the exclusive use of the premises for its business, and to exclude all other telegraph companies from the use of any portion of the building for the business of telegraphing, and the rent agreed to be paid under each lease was much larger than the premises were worth to complainant without such exclusive privileges, and it would not have entered into either of such leases, or paid the rental therein fixed, without the restrictive covenants above named. October 1, 1892, rumors having come to the knowledge of complainant that the Western Union Telegraph Company was negotiating for the purchase of the building from the Phenix company for the purpose of using it in its telegraph business, a written notice was served by complainant upon the Western Union company, in Chicago, notifying it of complainant's exclusive rights, and of the recording of the lease of April 30, 1892, in the recorder's office of Cook county. October 5, 1892, a similar notice was served by complainant on the defendant in the city of New York. It is claimed by the Western Union company that it had been in negotiation for the purchase of the premises for some time prior to October 1, and that on October 3, without actual knowledge of the restrictive covenant in the lease, it made a written contract with the Phenix company for the purchase of the building for the sum of $1,500,000, "subject only to the agreements with the Traders' company and the Imperial company, owning the

buildings in the rear," possession to be given, if possible, on or before October 15, 1892, $750,000 payable on completion of the examination of title, the balance within sixty days. After the making of the contract, and before completing the purchase and receiving the deed, and before payment of any part of the purchase money, counsel for the Western Union company examined the lease, and advised that company that the restrictive covenant could not be enforced against it.

This bill of complaint was filed October 25, at 9:45 A. M., and application was immediately made to fix a day for the hearing of the motion for a preliminary injunction. Tuesday, November 1, was fixed for the hearing, and notices were, within a few minutes, served upon the Western Union company and upon the Phenix company in Chicago. The conveyance of the premises by the Phenix company to the Western Union company, executed in New York City, is dated and acknowledged October 25, and was recorded in the recorder's office of Cook county October 28. The deed recites a consideration of $1,500,000, and contains this covenant: "Subject, nevertheless, to the party-wall agreements between the party of the first part and the Imperial company and Traders' company owning the buildings south of the premises hereby conveyed, and the licenses to said companies, and subject also to the outstanding leases held by the tenants in the building on the premises hereby conveyed." It also contained the following covenant: "Third, that the said premises are free from encumbrance, except as aforesaid."

The Western Union company proposes to take immediate possession of the building, and to use that portion of the basement fronting north on Jackson street and west on Pacific avenue for its general receiving and delivery office, and to establish its other business and managing offices and operating rooms in the upper floors of the building. It is claimed by complainant that such use

of the building will greatly damage and injure its business; that the injury will be continuous and irreparable throughout the entire term of its lease, and that adequate remedy can be had only by enjoining such threatened use of the premises. It is claimed by the Western Union company that its use of the premises will greatly benefit complainant by establishing a "telegraphic center," in that locality, and by bringing additional business to complainant's office. It is also claimed by defendant that its lease of its present general office at the corner of Washington and LaSalle streets expires April 30, 1893; that such lease cannot be renewed because the building is to be torn down after that date, and that it is unable to find any desirable premises, suitably located, for its business in the city of Chicago other than the Phenix building. Upon the facts, as above shown, complainant seeks to enjoin the Western Union company from the use of the premises for its telegraph business until April 30, 1898.

To this bill the defendant filed its sworn answer, which may be summarized as follows : The answer, after admitting the allegations of the bill with reference to the location of the building and its suitableness for receiving and delivery offices, denies that the principal inducement by which the complainant was governed in making its lease was the right to exclude all other telegraph companies from the use of the building for the business of telegraphing. On the contrary, it is averred that for many years it has been the general policy of the Postal company, and all telegraph companies competing with the Western Union, to locate their offices as near as possible to those of the Western Union, the latter having been longer engaged in the business and having a vastly greater number of offices than the complainant. It is averred that the complainant has always derived far greater benefits from having its offices near to the Western Union than it could possibly receive from any legiti-

mate use of an exclusive privilege or right in any given building. The defendant admits the purchase of the building from the Phenix company, and that it intends to use a part of the upper stories for its executive offices and operating rooms, and to establish its public receiving and delivery office in the west part of the street floor fronting on Pacific avenue and Jackson street, being at the opposite end of the building from the office of complainant; that there is no intention to disturb or interfere with the complainant's use of that portion of the building described in its lease. It is shown that for many years the defendant has had general public telegraph offices in close proximity to the Phenix building, —one of them within two hundred and fifty feet and another within one hundred feet of its proposed new office. It is insisted that the establishment of the receiving and delivery office, as intended, will not injuriously affect the complainant's business or result in any diminution of its profits, but that, on the contrary, the establishment by the defendant of its principal receiving and delivery office in the building will tend very largely to increase the complainant's business; that regular patronage will not be much affected either way, and that the volume of transient business which will come in the vicinity of the building will be immensely increased by the establishment of the defendant's office there; that by far the greater part of the transient business will come from the direction of Clark street, passing complainant's office before reaching that of defendant, and a great share of it will reach complainant's office which otherwise would be handled by defendant at its other offices in the city. The answer further shows the acceptance by the defendant of the act of Congress of July 24, 1866, whereby it became an instrument of inter-State commerce; that the defendant handles a vast amount of telegraph business necessary for conducting the operations of the United States government; that Chicago has become the most

important receiving and distributing point for the tele-
graph business of the country, and that any interrup-
tion to the defendant's telegraphic service in Chicago
would virtually paralyze a large part of the business of
the United States. The answer further shows, that with
the growth of the city and the increase of business it has
become increasingly difficult to make the necessary con-
nections into and through the city, most of the lines in
the city now being constructed underground instead of
on poles in the streets and alleys ; that this underground
construction is slow, laborious and complicated, and the
adjustment of the defendant's lines in the Phenix build-
ing will necessarily be underground, and will be difficult
and slow of construction, and accordingly long notice and
ample time for construction and alterations are necessary
for the removal of defendant's business from one location
to another.

It is shown that the defendant, for more than ten
years, has had its main office at Washington and LaSalle
streets, and that its lease of the premises will expire
April 30, 1893, and that in the spring of 1892 the defend-
ant became aware that it would be impossible to renew
or extend the lease. In view of the necessity of ample
time for preparations, and in view of the expected mass
of business to be handled in connection with the World's
Fair, preparations were immediately entered upon for
securing a building, and negotiations were commenced
for the purchase of the Phenix building long before
August 4, 1892, when the Postal company's lease was
recorded ; that the defendant then had no notice or infor-
mation of the existence of said lease, and never received
such notice or information until October 1, before which
time the negotiations were substantially completed and
defendant had abandoned its search for other premises.
The answer shows that on receipt of the notice served,
on October 3, the opinion of counsel was sought as to the
effect of the covenants in the lease, which opinion was

to the effect that the covenants did not deprive the Phenix company of the power to sell the building for any purpose, nor could it be so construed as to deprive the defendant of the right to purchase and use it for telegraph business, and thereupon, in good faith, not intending to injure or interfere with the complainant's business, but solely for the purpose of providing for itself the only available premises which it could secure and prepare for the transaction of its business within the time allowed, the defendant purchased the building for $1,500,000; that the time between now and May 1, 1893, is scant and insufficient for the re-adjustment of the defendant's lines and their introduction and installation in the Phenix building, particularly in view of the approach of winter, and the probable interruption of out-door and underground work, and any injunction restraining the defendant from occupying the building for its telegraph business will cause enormous and wholly incalculable damage and loss, not only to the defendant, but to the business interests of the country at large, amounting, as the defendant believes, to many millions of dollars; that the damage to the complainant, on the other hand, from the defendant's use of the building, will be inappreciably small; that there can be no substantial damage from loss of business, and if it be true that the complainant has agreed to pay a higher rental by reason of the exclusive covenant than it would have paid without the covenant, such increased rental is measurable in money, and can be fully compensated in an action at law, the defendant and the Phenix Insurance Company being abundantly solvent.

It is insisted, as a matter of law, that the covenant is in no way binding upon the defendant; that it is not such a covenant as runs with the land, and does not purport to bind the assigns of the lessor, but is a merely personal covenant, for any breach of which damages can be recovered against the Phenix company in an action at law.

The covenant further does not attempt to prohibit the use of the building by the owner thereof for telegraphic purposes, nor to prohibit the sale thereof by the Phenix company. The defendant does not intend to lease any office in the building to any person or company for use as a telegraph office, and insists that the covenant should not be enforced except in strict accordance with its terms.

An application for a temporary injunction was heard on bill, answer and affidavits, and the motion for the same was denied, and as the only relief sought was an injunction, the court dismissed the bill for want of equity, and appellant prosecuted an appeal to the Appellate Court for the First District, where that decree was affirmed, and it prosecutes this appeal.

J. L. HIGH, for appellant:

Where premises are leased with a restrictive covenant limiting the use of such premises, or giving the lessee their sole use, to the exclusion of any business which may interfere with his own, equity will enjoin a breach of such covenant by the lessor or his assigns. Kerr on Injunctions, 396-400, and cases cited; *Altman* v. *Aquarium Society*, 3 Ch. Div. 228; *Tulk* v. *Moxhay*, 2 Ph. 774; *Jay* v. *Richardson*, 30 Beav. 563; *Nicholson* v. *Rose*, 4 DeG. & J. 10; *Rankin* v. *Huskisson*, 4 Sim. 13; *Frogley* v. *Earl of Lovelace*, Johns. 333; *Manhatten Manf. Co.* v. *Stock Yards Co.* 8 C. E. Green, 161; *Kirkpatrick* v. *Peshine*, 9 id. 206; *Telegraph Co.* v. *Rogers*, 42 N. J. Eq. 311.

Upon similar grounds equity will, at the suit of a lessor or his assigns, enjoin the lessee or his assigns from the violation of covenants in the lease restricting the use and mode of enjoyment of the demised premises, the principles upon which the relief is granted, in both classes of cases, being the same. *Clegg* v. *Hands*, 44 Ch. Div. 503; *Luker* v. *Dennis*, 7 id. 227; *Barret* v. *Blagrave*, 5 Ves. 555; *Tod-Heatly* v. *Benham*, 40 Ch. Div. 80; *Kemp* v.

*Sober*, 1 Sim. 517 ; *Stees* v. *Kranz*, 32 Minn. 313 ; *Wilkinson* v. *Rogers*, 12 W. R. 284 ; *Bray* v. *Fogarty*, I. R. 4 Eq. 544 ; *Parker* v. *Whyte*, 1 H. & M. 167; *Evans* v. *Davis*, 10 Ch. Div. 747; *Mason* v. *Mason*, Flan. & K. 429.

The covenant, being one which concerns the use and enjoyment, in a particular manner, of the demised premises, is inherent in the very estate granted. It is, therefore, a covenant running with the land, and complainant is entitled to the same relief against subsequent purchasers as against the original lessor. 1 Wood on Landlord and Tenant, 676, and cases cited; Taylor on Landlord and Tenant, (6th ed.) secs. 261, 262, and cases cited; *Spencer's case*, 5 Coke, 16 ; *Norman* v. *Wells*, 17 Wend. 136 ; *Clegg* v. *Hands*, 44 Ch. Div. 503 ; *Wilkinson* v. *Rogers*, 12 W. R. 284; *Tatem* v. *Chaplin*, 2 H. Bl. 133; *Trustees* v. *Cowen*, 4 Paige, 510; *Barron* v. *Richard*, 3 Edw. Ch. 96; *St. Andrew's Church's Appeal*, 67 Pa. St. 512; Rev. Stat. chap. 80, sec. 15.

It is, however, wholly immaterial whether the restrictive agreement is technically a covenant running with the land, since, if it is regarded as a mere personal covenant of the lessor, subsequent purchasers with notice may be enjoined from a breach of the covenant. *Tulk* v. *Moxhay*, 2 Ph. 774; *Catt* v. *Tourle*, L. R. 4 Ch. 654 ; *Kirkpatrick* v. *Peshine*, 9 C. E. Green, 206; *Frye* v. *Partridge*, 82 Ill. 267.

Complainant is entitled to an injunction, regardless of the extent of the injury which may result from a breach of the covenant. The covenantee is entitled to the full enjoyment, *modo et forma*, of the estate granted, and it is for him to say whether the covenant shall be violated. *Kirkpatrick* v. *Peshine*, 9 C. E. Green, 206; *Stewart* v. *Winters*, 4 Sandf. Ch. 587; *Coal Co.* v. *Schmisseur*, 135 Ill. 371; *Hills* v. *Miller*, 3 Paige, 254; *Tipping* v. *Eckersley*, 2 Kay & J. 264; *Dickenson* v. *Canal Co.* 15 Beav. 260; *Kemp* v. *Sober*, 1 Sim. 517; *Lord Manners* v. *Johnson*, 1 Ch. Div. 673; *St. Andrew's Church's Appeal*, 67 Pa. St. 512.

FRANK J. LOESCH, also for appellant :

Covenants in leases should be construed most beneficially for the lessee. *Daunn* v. *Spurrier*, 1 B. & P. 399; *Maroni* v. *Stone*, 2 Cow. 781.

A promise is to be interpreted in that sense in which the promisor knew that the promisee understood it. *Barlow* v. *Scott*, 24 N. Y. 40; *Potter* v. *Insurance Co.* 5 Hill, 147; 2 Kent's Com. 557.

A negative covenant will sometimes be imported into an affirmative covenant, and relief afforded by injunction. Thus, lessees who had covenanted to manage land or cultivate a farm in a husbandlike manner have been restrained from doing acts of bad husbandry, although there was no express covenant to refrain from such acts. Bispham's Eq. Jur. sec. 464; *Drury* v. *Molines*, 6 Ves. 328; *Briggs* v. *Law*, 4 Johns. Ch. 23 ; Kerr on Injunctions, 522; High on Injunctions, (3d ed.) sec. 1164, and authorities cited ; *McIntyre* v. *Belcher*, 14 C. B. (N. S.) 654 ; *Angier* v. *Webber*, 14 Allen, 211 ; *Dwight* v. *Hamilton*, 113 Mass. 175 ; *Munsey* v. *Butterfield*, 133 id. 492 ; *Leavers* v. *Cleary*, 75 Ill. 349.

Appellee is bound to the same extent as its grantor, because it has taken the estate with notice of a valid agreement concerning it, which it cannot equitably refuse to perform. *Insurance Co.* v. *Insurance Co.* 87 N. Y. 408 ; *Lewis* v. *Gollner*, 129 id. 227; *Hodge* v. *Sloan*, 107 id. 244; *Parker* v. *Nightingale*, 6 Allen, 341; *Whitney* v. *Railway Co.* 11 Gray, 359 ; *Newbold* v. *Peabody Heights Co.* 70 Md. 493 ; *Leavers* v. *Cleary*, 75 Ill. 349 ; *Frye* v. *Partridge*, 82 id. 267; *Willoughby* v. *Lawrence*, 116 id. 11.

A restrictive covenant need not affect the very room or property demised. *Altman* v. *Aquarium Society*, 3 Ch. Div. 228 ; *Rankin* v. *Huskisson*, 4 Sim. 13 ; *Jay* v. *Richardson*, 30 Beav. 563 ; *Norman* v. *Wells*, 17 Wend. 136 ; *Manhattan Manf. Co.* v. *Stock Yards Co.* 8 C. E. Green, 161; *Lewis* v. *Gollner*, 129 N. Y. 227.

JOHN F. DILLON, RUSH TAGGART, and WILLIAMS, HOLT & WHEELER, for appellee :

The construction of the covenant is the same in equity as at law. Chitty on Contracts, (ed. of 1860,) 77, 78, and cases cited; 2 Parsons on Contracts, *494, and note ; Kerr on Injunctions, (2d ed.) 388-391; Bishop on Contracts, sec. 427; 2 Kent's Com. *554.

The meaning of the covenant must be determined by what it says, and cannot be enlarged by speculation or conjecture. *Bast* v. *Bank*, 101 U. S. 96 ; *Field* v. *Mills*, 33 N. J. L. 254; *Coal Co.* v. *Schmisseur*, 135 Ill. 371.

Implied covenants are not favored. Wood on Landlord and Tenant, (ed. of 1881,) 521; *Sharp* v. *Waterhouse*, 7 E. & B. 816 ; *Aspdin* v. *Austin*, 5 Q. B. 671; *Sheets* v. *Selden*, 7 Wall. 416 ; *James* v. *Cochrane*, 7 Exch. 177; *Doe* v. *Guest*, 15 M. & W. 160 ; *Dunn* v. *Sayles*, 5 Q. B. 685 ; 2 Woodfall on Landlord and Tenant, 675 ; *Railway Co.* v. *Railway Co.* 135 U. S. 576.

The covenant, being in partial restraint of the beneficial use of property, will be strictly construed, and not extended by implication. Taylor on Landlord and Tenant, (5th ed.) secs. 402, 403, 406 ; *Hutchinson* v. *Ulrich*, 145 Ill. 542 ; *Eckhart* v. *Irons*, 128 id. 582 ; 1 Washburn on Real Prop. (5th ed.) *317; *Livingston* v. *Stickles*, 7 Hill, 253, and cases cited; Lawson on Rights, Remedies and Practice, secs. 2843, 2844; *Field* v. *Mills*, 33 N. J. L. 254; *Brugman* v. *Noyes*, 6 Wis. 1; 4 Kent, (12th ed.) *131; Gray on Restraints on Alienation, secs. 4, 5 ; *Fox* v. *Swann*, Styles, 482.

The covenant, in express terms restricting only the right to lease offices in the building, does not attempt to limit, and has not the effect of limiting, the use of the building by the owner for any purpose whatever. *Kemp* v. *Bird*, 5 Ch. Div. 549.

The covenant is, in its terms, purely personal to the lessor, the Phenix Insurance Company. It does not relate to the demised premises. It therefore does not bind the Western Union Company as assignee of premises not

demised.    1 Washburn on Real Prop. (5th ed.) *317; *Seers v. Hind,* 1 Ves. Jr. 294; *Norcross* v. *James,* 140 Mass. 188.

The covenant does not run with the land.    *Ferry Co.* v. *Railway Co.* 94 Ill. 83; *Gibson* v. *Holden,* 115 id. 199; *Fitch* v. *Johnson,* 104 id. 111, and cases cited.

Nor will it be enforced against a purchaser with knowledge, since it does not concern the manner of use of the demised premises.    *Transportation Co.* v. *Pipe Line Co.* 22 W. Va. 600; *Brewer* v. *Marshall,* 19 N. J. Eq. 537.

The complainant claiming the benefit of an implied covenant only, is not, in any case, entitled to an injunction, in the absence of irreparable damage.    *Coal Co.* v. *Schmisseur,* 135 Ill. 371.

In no event was this a case for a preliminary injunction.    High on Injunctions, sec. 13, 1136; *Child* v. *Douglas,* 5 D., M. & G. 739; Hilliard on Injunctions, sec. 39; *Wilkinson* v. *Rogers,* 12 W. R. 284; *Railroad Co.* v. *Railroad Co.* 1 Sim. 434; 2 Daniell's Ch. Pr. 1640.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The material question arising on this record is as to the construction and effect of the clause in the second lease, as follows: "During the said term the lessor will not lease offices in said building to any other telegraph company for use as a telegraph office, without consent of the lessee."    The contention of the appellant is, that it is a restrictive covenant, limiting and restricting the use of the entire building for telegraph offices to itself, and the use for that purpose by the lessor or its assigns would be a breach of that covenant which a court of equity should enjoin, regardless of the extent of the injury which might result from its breach.

The covenant prohibits the lessor from leasing any of the offices in said building for a telegraph office to be used by another company, and is therefore in restraint of a beneficial use of the real estate.    Restrictions on the

power of alienation have long been unfavored, and the policy of this State has ever been hostile to them, and this principle is so firmly engrafted on our polity that such covenants will be construed with the utmost strictness, to the end that the restraint shall not be extended beyond the express stipulation; and all doubts, as a general rule, must be resolved in favor of a free use of property and against restrictions. This principle has come to be the settled rule of most of the States, as it is also of England. *Hutchinson* v. *Ulrich,* 145 Ill. 336; *Eckhart* v. *Irons,* 128 id. 568; *Boyd* v. *Fraternity Hall Ass.* 16 Ill. App. 574 ; *Livingston* v. *Stickles,* 7 Hill, 253 ; *Brugman* v. *Noyes,* 6 Wis. 1; *Crusoe* v. *Bugby,* 2 W. Bl. 776; 1 Washburn on Real Prop. 317; Taylor on Landlord and Tenant, sec. 402; 4 Kent's Com. 131.

In *Eckhart* v. *Irons, supra,* it was held : "If there is any doubt whether the restrictions were to cease then (at the end of fifteen years) or whether they were to be permanent, the existence of the doubt is to deny the existence of the easement or privilege. *All doubts must be resolved in favor of natural rights, and against restrictions thereon.*" This language is quoted with approval in *Hutchinson* v. *Ulrich, supra,* where it is further said : "In this country real estate is an article of commerce. The uses to which it should be devoted are constantly changing as the business of the country increases and as its new wants are developed ; hence it is contrary to the well recognized business policy of the country to tie up real estate, where the fee is conveyed, with restrictions and prohibitions as to its use, and hence, in the construction of deeds containing restrictions and prohibitions as to the use of property by a grantee, all doubts should, as a general rule, be resolved in favor of a free use of property and against restrictions." If there is doubt as to the meaning of the covenant it must be resolved adversely to the restriction, but in determining its meaning that

must be found from the language used, which is not to be extended or enlarged by implication.

In *Consolidated Coal Co.* v. *Schmisseur*, 135 Ill. 371, it was held: "We have been referred to no case holding that a court of equity would exercise its jurisdiction to prevent a breach of a negative covenant unless it was express, or could fairly be implied from the stipulation of the parties, and injury would result to complainant by its breach. * * * The party not having seen fit to expressly stipulate against the act in his contract, a court of equity will not, by implication, insert it, and then enforce it, unless substantial injury is thereby to be prevented." Wood on Landlord and Tenant, 521; *Sheets* v. *Selden*, 7 Wall. 416; *DesMoines Railway Co.* v. *Wabash Railway Co.* 135 U. S. 576.

The covenant does not place any restriction on the use of the building by the owner, further than an inhibition to leasing any offices for use as a telegraph office by another company, and a court cannot interpolate into that contract something it does not contain, and make it apply to the use of the building instead of the leasing to another.

*Kemp* v. *Bird*, 5 Ch. Div. 549, was a case where Bird had leased premises to Fairweather, who had assigned to Kemp, for use as a coffee-house, with a covenant not to demise or let any house on the same street for a like use during the term. Afterward Bird leased to one Slye another house on the same street, with a covenant not to engage in any business there without Bird's consent, and with Bird's consent Slye assigned to Godfrey, who established a coffee-house therein. Kemp filed a bill for injunction, based on the covenant in his lease, and the injunction was denied, because the covenant prohibited only the letting, and not the use or sale, of the property for the specified purpose, and on appeal the decision was affirmed, and it was said by JAMES, L. J.: "I am of opinion that the judgment of the learned judge in this case cannot be disturbed. Persons ought to look after their

own interests in framing their own covenants. Persons who are men of business, as they were here, are able to get protection and advice, and they must make their covenants express, so as to state what they really mean, and *they cannot get a court of law or of equity to supply something which they have not stipulated for, in order to get a benefit which is supposed to have been intended.* Here, the words are very plain, and the covenant is intelligible and reasonable as it stands, (as Mr. Justice FRY has observed,) whatever may be the extent or effect of it. It is, that the said G. Bird shall not, during the said term, demise or let any or either of the messuages or tenements now forming the said street, called London street, Paddington, between Arthur News and Francis News, to any person whomsoever, for the purpose of carrying on the trade or business of an eating-house, etc. *He may not demise it or let it for that purpose.* * * * If it had been intended that there should have been a positive restriction on the *use* of the premises during the term, there is a well-known form which the parties might have used, which would have been binding on the owner and on his representatives and on the assignee,—that is, that the said G. Bird, his heirs, executors, administrators and assigns, shall not, during the said term, demise or let, *or permit any of the said messuages or tenements to be demised or let,* and so on. It is quite clear that Bird did not intend to enter into such a covenant. By what right are we to extend this covenant beyond the words in which it is expressed—that is, that he shall not demise or let ? He *has not demised or let."* BAGGALLAY, L. J.: "I am of the same opinion. The appellant contends that Mr. Justice FRY has acted on the strict construction of the covenant and of the other provisions contained in the lease, *whereas he ought to have had more regard to what was the evident object and intention of the parties.* I know of no possible way, when it is alleged that there have been breaches of contract, of finding out what was the intention of the parties,

than by looking at what is found in the covenant itself. The appellant is desirous to deduce from those terms something far beyond what the document itself puts forth, and if once we were to adopt that method in this court we should introduce very great confusion into the construction of documents of this kind." COTTON, L. J.: "I cannot see that it can be said, with any fairness, that there is a general covenant by Bird not to allow the house to be used for the purpose of an eating-house ; and I think that the covenant with Godfrey was not a covenant entered into for the benefit of the plaintiff, but was for the benefit of the landlord, to be enforced as he might see fit."

In *Apsdin* v. *Austin*, 5 Q. B. 671, the plaintiff agreed to manufacture for the defendant cement of a certain quality, and the defendant, on condition of the plaintiff's performing such engagement, promised to pay him four pounds weekly during the two years following the date of agreement and five pounds weekly during the next year following, and to receive him into partnership at the expiration of three years.   Within less than two years the defendant discharged the plaintiff, who sued for damages, alleging an agreement to employ him for three years.   The declaration was held bad on demurrer, Lord DENMAN delivering the judgment.   He says: "Upon the face of this agreement it is certainly true that in terms there is no stipulation for retaining the plaintiff in the defendant's service; but it is alleged for the plaintiff that, *in substance*, it is a contract of hiring and service of a special kind, and that an agreement to retain during three years is necessarily to be implied from the express stipulation for weekly wages during that period. * * * It is a manifest extension of the principle to hold that, where parties have expressly covenanted to perform certain acts, they must be held to have impliedly covenanted for every act convenient or even necessary for the perfect performance of their express covenants.   When parties

have entered into written engagements with express stip-
ulations it is manifestly not desirable to extend them by
any implication.  The presumption is that, having ex-
pressed some, they have expressed all the conditions by
which they intend to be bound under that instrument.
It is possible that each party to the present instrument
may have contracted on the supposition that the busi-
ness would in fact be carried on, and the service in fact
continued, during the three years, and yet neither party
might have been willing to bind themselves to that effect;
*and it is one thing for the court to effectuate the intention of the
parties to the extent to which they may have, even imperfectly,
expressed themselves, and another to add to the instrument all
such covenants as upon a full consideration the court may deem
fitting for completing the intentions of the parties, but which
they, either purposely or unintentionally, have omitted.*  The
former is but the application of a rule of construction to
that which is written; the latter adds to the obligations
by which the parties have bound themselves, and is, of
course, quite unauthorized, as well as liable to great
practical injustice in the application."

In *Consolidated Coal Co.* v. *Schmisseur, supra,* it was held:
"In our judgment the contract is susceptible of no other
construction than that the grantees and their assigns
have the whole term of thirty-five years in which to mine
and remove the coal underlying appellee's land, without
limitation or restriction.  The condition is, simply, that
if they shall, before the expiration of the term, exhaust
the coal, possession is to be surrendered.  Appellee might
have imposed terms requiring exhaustion of the coal as
rapidly as it could be mined, or that a stipulated amount
should be taken out per month or per year, or some like
provision; but she did not do so.  The contract is wholly
silent upon that subject, and contains no provision re-
quiring the removal of the coal before the end of the
term.   *   *   *   The provision in the contract under con-
sideration, in respect of the leasehold interest, is, simply,

that it is granted for the purpose of enabling said purchasers to sink pits or shafts, and successfully mine and remove the coal conveyed to them by appellee. Unquestionably, appellee might, had she seen proper, have restricted the use of the land leased by express stipulation, and have required the lessees to covenant against any use she might have deemed antagonistic to her interests. She did not do so."

The principle announced in these cases is sustained in *Sheets* v. *Selden*, 7 Wall. 416, *Livingston* v. *Stickles*, *supra*, and *Field* v. *Mills*, 33 N. J. L. 254, where it is held that an assignment is not a violation of a covenant in a lease not to under-let. To the same effect is *Fox* v. *Swann*, Styles, 482. The principle announced in the above cases is in consonance with the policy of the removal of restraints on alienation, and strict construction of restrictive covenants.

We hold the clause in the lease did not prevent the owner of the building from using the building or offices therein for the purpose of a telegraph office, and when the Western Union became the purchaser of the property and a conveyance was made to it, it had the right, as owner, to use offices therein as a telegraph office, and in so doing was not leasing offices to another company for use as a general telegraph office, and hence, in so using them, was not violating any of the covenants of the lease. Cases that are strictly included within the terms of the language employed in the covenant may be enjoined, and the numerous cases cited in the very able briefs of counsel for the appellant are of that character. Without attempting to analyze and discuss those cases, we find no principle announced in any well considered case in conflict with what is here held.

From a careful examination of this question we are of opinion that there was no error in the decree of the circuit court nor in the judgment of the Appellate Court, and that judgment is affirmed.    *Judgment affirmed.*